**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LORI LONG, JAMES ABREU, SCOTT BAUER, and CRAIG CORLEW, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

BOMBARDIER RECREATIONAL PRODUCTS INC. and BRP US, Inc.,

Defendants.

CLASS ACTION

CASE NO.

JURY TRIAL DEMANDED

# **CLASS ACTION COMPLAINT**

Plaintiffs, Lori Long, James Abreu, Scott Bauer, and Craig Corlew (together, "Plaintiffs"), bring this Complaint individually and on behalf of all others similarly situated, against BOMBARDIER RECREATIONAL PRODUCTS INC. and BRP US, INC., for violations of state consumer protection laws and unjust enrichment and allege as follows:

## **INTRODUCTION**

1. This is a proposed class action lawsuit brought on behalf of Plaintiffs and others like them who purchased a jet-powered pontoon boat sold by Defendants that contains a dangerous and defective design.

2. Under the brand name "Sea-Doo," Bombardier Recreational Products Inc. and BRP US, Inc. (together "Bombardier") design, manufacture, market, and distribute various models of personal watercraft and pontoon boats throughout the United States, including in Florida.

3. Bombardier represents its Sea-Doo pontoon boats as safe, seaworthy recreational vessels suitable for the enjoyment of consumers and their families.

4. In reality, however, the Sea-Doo Switch pontoon boats contain a dangerous design defect that allows water to accumulate in the vessel's hull, causing the boat to lose stability, nose-dive, and capsize.

5. This design defect creates a serious safety hazard that can result in passengers being thrown into the water, suffering severe injury, or drowning. Tragically, this defect has already been linked to multiple fatal incidents.

6. Bombardier ultimately issued a recall of the Sea-Doo Switch boats but falsely represented to consumers that the defect could be remedied through a repair.

7. In truth, the proposed recall repair does not eliminate the underlying design defect and does not make the vessels reasonably safe for their intended use.

8. Bombardier's omissions and misrepresentations regarding the seaworthiness of these boats, including its failure to disclose the defect and its misleading representations regarding the effectiveness of the recall repair, deceived consumers, who paid a premium price for vessels that were worth substantially less than represented.

**PARTIES**

9. Plaintiff Lori Long is and at all material times was a resident and citizen of Palm Beach County, Florida.

10. Plaintiff James Abreu is and at all material times was a resident and citizen of Lee County, Florida.

11. Plaintiff Scott Bauer is and at all material times was a resident and citizen of Lee County, Florida.

12. Plaintiff Craig Corlew is and at all material times was a resident and citizen of Indiana, but maintains a residence in Monroe County, Florida, where he maintained the boats that are at issue in this lawsuit.

13. Defendant Bombardier Recreational Products Inc. ("BRP Canada") is a Canadian corporation with its principal place of business in Valcourt, Quebec, Canada. Bombardier Recreational Products Inc. designs, engineers, manufactures, and places into the stream of commerce Sea-Doo watercraft and related products, including the vessels at issue in this action.

14. Defendant BRP US, Inc. ("BRP US" and together with "BRP Canada," "Bombardier") is a corporation organized under the laws of the State of Delaware with its principal place of business in Sturtevant, Wisconsin. BRP US markets, distributes, imports, and sells Sea-Doo products, including the vessels at issue in this action, throughout the United States, including within the State of Florida.

15. BRP Canada acts through BRP US as its agent for U.S. marketing, distribution, and sales, and BRP US's Florida contacts are attributable to BRP Canada.

16. BRP US and BRP Canada together, and through their agents and employees, manufactured, distributed and sold the vessels that are at issue in this case.

## JURISDICTION & VENUE

### A. Subject Matter Jurisdiction

17. This Court has original diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").

18. The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, at least one member in each of the proposed plaintiff classes is a citizen of a State different from Bombardier, and the number of members of all proposed plaintiff classes in the aggregate is not less than 100. 28 U.S.C. § 1332(d)(2).

**B. Personal Jurisdiction**

19. This Court has personal jurisdiction over the Bombardier Defendants because this is a civil action arising from their operating, conducting, engaging in, or carrying on a business or business venture in this state. Fed. R. Civ. P. 4(k)(1)(a) & Fla. Stat. § 48.193(1)(a) (2023).

20. This Court also has personal jurisdiction over Bombardier because this is a civil action arising from Bombardier committing a tortious act within this state. Fed. R. Civ. P. 4(k)(1)(a) & Fla. Stat. § 48.193(1)(a) (2023).

21. Bombardier's unfair and deceptive omissions and misrepresentations regarding the Capsizing Defect were directed at Florida consumers, received by Florida consumers, and caused economic injury to Florida residents, including Plaintiffs, within this state.

22. Bombardier purposefully directed its marketing, advertising, and sales activities toward Florida consumers. Specifically, Bombardier is engaged in the advertising and marketing and sale of its Sea-Doo Switch boats in Florida.

23. Bombardier derives substantial revenue from the sale of these Sea-Doo vessels and related products in Florida.

24. On the Sea-Doo website, Bombardier represents that it sells its Sea-Doo products in approximately three dozen stores throughout Florida and features a function that allows Florida consumers to search for the most conveniently located store.

25. Bombardier deliberately and systematically served the Florida market for the Switch boats, through the marketing, promotion, and sale of defective Switch boats to Florida residents, including Plaintiffs Long, Abreu, and Bauer, all of whom purchased their Switch boats from Florida dealers. Plaintiffs used their Switch boats in Florida and have suffered their injury alleged in this lawsuit in Florida. Thus, Plaintiffs' claims arise out of and relate to Bombardier's contacts with Florida.

**C. Venue**

26. Venue is proper in this district because a substantial part of the events and omissions giving rise to the claim occurred in this district. 28 U.S.C. § 1391(b).

## CONDITIONS PRECEDENT

27. All conditions precedent to this action have occurred or been performed.

## FACTUAL BACKGROUND

**A. Bombardier's Products**

28. Defendant Bombardier began decades ago as a Canadian manufacturer of recreational vehicles. In 1968, the company's predecessor, Bombardier Limited, introduced the first Sea-Doo line of personal watercrafts. Today Sea-Doo watercrafts are marketed and sold worldwide through Defendant Bombardier's authorized dealer network.

29. Under the brand Sea-Doo, Bombardier offers for sale "personal watercrafts," also known as "jet skis," and pontoon boats.

30. Among the pontoon boats that Bombardier designs, manufactures, markets, and sells are the "Switch" models. Bombardier offers several different trims of Sea-Doo "Switch" boats, which it markets as the "Switch," the "Switch Cruise," "Switch Cruise Limited," "Switch Sport," and "Switch Fish." The entire "Switch" product line of boats are at issue in this lawsuit (the "Switch" or the "Switch boats").

31. Bombardier advertises the Switch Boats on their website as follows:



2026

## Switch

Starting at **$24,799**

Transport and preparation not included.

Experience a whole new way to enjoy life on the water. The 2026 Sea-Doo Switch redefines fun and freedom with a modern, modular design and unbeatable all-in-one value. *Trailer included in MSRP




2026

## Switch Cruise

Starting at **$38,999**

Transport and preparation not included.

The 2026 Switch Cruise is a modern pontoon boat that blends Sea-Doo spirit with true pontoon comfort. Its modular deck and Rotax power make every outing easy, fun and versatile. *Trailer included in the MSRP




2026

**Switch Cruise Limited**

Starting at **$52,499**

Transport and preparation not included.

Unmatched comfort, premium convenience and cutting-edge tech come together in the 2026 Switch Cruise Limited. This exclusive pontoon package turns every ride into a luxurious escape. *Trailer included in the MSRP




2026

**Switch Sport**

Starting at **$30,449**

Transport and preparation not included.

The 2026 Sea-Doo Switch Sport is a pontoon boat built for tow sports fans and active families. Its bold style and modular layout bring comfort, excitement and utility together in one incredibly versatile package. *Trailer included in the MSRP



2026

**Switch Fish**

Starting at **$36,699**

Transport and preparation not included.

The 2026 Switch Fish is a fishing pontoon boat built for serious catches and family fun. A modular layout, fishing-ready features and Rotax power let you cruise, cast and chill on one adaptable pontoon. *Trailer included in the MSRP

32. The Switch boats were first sold in 2022 and Defendant Bombardier continues to sell these boats.

**B. Bombardier's Sea-Doo Switch Boats Feature a Design Defect that Causes Them to Capsize.**

33. Bombardier touts its Switch pontoon boats as "offering the perfect blend of comfort and leisure."

34. On its website, Bombardier encourages consumers to browse the various Switch trims to identify "the right pontoon for you," based on "usage," "features," and "rider-capacity."

35. Bombardier attempts to market its Switch boats broadly, to a wide variety of consumers. For example, Bombardier claims Switch boats are ideal both for consumers desiring "low-cost lake days," and those wanting a "luxurious escape."

36. Bombardier also provides a plethora of written information to consumers about the different Switch boats. It provides photographs of the products and details on their engines and hulls. For example, Bombardier provides some version of the following graphic on its website for each of these boats:

| Engine | Fuel Capacity | Storage Capacity | Rider Capacity | Hull Material |
|---|---|---|---|---|
| Rotax 1630 ACE™ - 170 ECT | 29 US gal / 109.8 L | 119.6 US gal / 452.6 L | 8 riders | Polytec™ |

37. Bombardier also provides consumers the ability to download a "spec sheet" which is approximately two pages in length, for each Switch boat model. These spec sheets purport to provide all relevant information about the boats.

38. Bombardier sold the Switch boats from 2022 through today.

39. The "starting at" prices for the Switch boats range from $24,799.00 to $52,499.00.

40. What Bombardier did not disclose to consumers fully and accurately, is that the Switch boats feature a defective design that renders them unsafe for normal use.

41. All the Switch boats feature a triple pontoon system used to float the boats, comprised of pontoons along the side of the center hull (also known as outboard sponsors) and a forward bow deflector that is attached to the front of the motor hull. These three pontoon sections are not watertight by design; they are comprised of foam, which displaces the water and provides buoyancy. The water is intended to function as a ballast, increasing stability.

42. However, this design also allows the ballast water to flow forward and collect in the bow deflector, weighing down the bow. If the bow is already trimmed low (i.e., due to passengers seated in the forward portion of the boat), the flow of the ballast water forward can cause the front of the boat to submerge, and then to nose-dive and capsize.

43. Additionally, the Switch boats are designed such that the bow generates a wave that traverses rearward along the vessel's hull and creates stern lift and bow drop during low-speed operation. In other words, due to this bow wave, the rear of the vessel lifts up and the bow of the vessel to drops, creating a significant capsizing hazard, regardless of occupant location or weighting of the vessel.

44. In short, the design and hydrodynamic effect of the Sea-Doo Switch boats' hull is dangerous (as described in paragraphs 40-44, the "Capsizing Defect").

45. Since the Switch boats' introduction by Bombardier in 2022, multiple capsizing incidents have led to several fatalities and severe injuries as a result of the Capsizing Defect.

46. Because of certain of these incidents, in February 2025, Bombardier was forced to acknowledge this design defect by publishing a "Safety Recall Notice," and represented it as

follows:

**What is the potential problem?**
Improper distribution of passengers and cargo weight could overload the front of the watercraft and cause instability, nosediving and possibly lead to capsizing. The condition worsens if water evacuation from the hull is not optimal. This could cause serious injuries or even death.

**Which models are involved?**
MY22 to MY25 Sea-Doo Switch

(BRP US, Inc., Feb. 18, 2025, Safety Recall Notice Re: Front Overload- Risk of Capsizing)

47. The United States Coast Guard has since confirmed that the Switch boats feature an unsafe design, which it describes as follows:

> Vessel Design and Unsafe Operating Condition:
>
> The Switch is designed such that while at rest, its center hull allows water to enter the hull, and while operating on a plane, the entrained water empties. However, until the water fully empties, trim by the bow can occur, especially with passenger weight forward. The dynamics are such that any abrupt change in speed or direction could induce forces sufficient to cause capsizing, especially when slowing down towards idle speed.

(*U.S. Coast Guard, Marine Safety Alert 18-25*, Oct. 16, 2025).

48. The Coast Guard has determined that "[w]eather conditions and poor seamanship do not appear to be significant contributing factors" to the fatalities that the capsizing incidents that have occurred in Switch boats, resulting in injury or death.

## D. Bombardier Knew of the Capsizing Defect

49. Bombardier knew or should have known that the design of the Switch boats created a capsizing hazard before and during the entire time it marketed and sold these vessels, long before February 2025.

50. Bombardier possessed or should have possessed engineering analyses and testing data identifying the conditions under which water could accumulate in the forward hull and destabilize the Switch boats.

51. After the Switch boats were marketed and sold, Bombardier also received reports of capsizing incidents involving those vessels.

52. Government regulators likewise investigated the capsizing hazard, identifying incidents involving Switch boats capsizing as early as 2022.

53. Accordingly, Bombardier had or should have had knowledge of the capsizing defect and the conditions under which it occurs, superior to its consumers. In fact, the Capsizing Defect arises from the internal design and hydrodynamic behavior of the hull structure, which is not visible or discoverable by consumers.

54. Consumers purchasing Switch boats could not reasonably discover the defect through ordinary inspection or use.

55. Notwithstanding this superior knowledge and/or constructive knowledge of safety risks posed by the Capsizing Defect, Bombardier failed to fully and accurately disclose the Capsizing Defect to consumers when marketing and selling the Switch boats.

### E. Bombardier's Recalls Do Not Correct the Defect Pre-Sale and Bombardier Misrepresented that the Defect Could be Repaired.

56. In February 2025, Bombardier issued a safety recall concerning the Switch boats, but this recall notice did not remedy the omissions. In fact, it was only further misleading.

57. In connection with that recall, Bombardier acknowledged that improper passenger and cargo weight distribution could overload the front of the vessel and lead to instability, nosediving, and capsizing, but Bombardier proposed a recall remedy that involved applying sealant to portions of the hull and adding warning labels and instructional materials.

58. Specifically, Bombardier advised consumers that it could provide the following repairs to fix the issue:

**What will BRP do?**

- BRP will perform this recall at no charge to you (parts and labor).

- The procedures will take less than an hour and include:

1. Partial sealant application to specific sections of the hull (not required for Model Year 2025)

2. Adding two on-product warning labels and providing an Operator's Guide addendum

(2025-4 Bulletin, Front Overload-Risk of Capsizing).

59. Bombardier did not disclose to consumers that the proposed "sealant" remedy the ("February 2025 Repair") would not correct the underlying design defect. To the contrary, it led consumers to believe that the defect could be remedied fairly easily.

60. Bombardier also led purchasers of 2025 Switch boats to believe that their boats did not feature the defect at all.

61. But, in truth, the repair that Bombardier represented in February 2025 to be effective was not effective and capsizing incidents continued to occur. In at least one incident, a Switch watercraft capsized after it had already been repaired pursuant to Bombardier's recall guidance, resulting in multiple fatalities.

62. Eventually, but not until October 2025, Bombardier admitted that its February 2025 Repair was not effective and issued an updated safety recall, acknowledging that a component of the prior repair "may not perform to our expectations for durability."

63. Bombardier now told consumers that all Switch boats, whether previously repaired or not, and including model years 2025 and 2026, needed to be repaired.

64. Bombardier represented that "The sealant applied on the hull sections (by dealer or from factory) needs to be replaced by three gaskets" (the "October 2025 Repair").

65. Bombardier represented that "All watercrafts need three gaskets in specific sections of the hull. If your watercraft presently has sealant in those sections, it will be removed prior to

the installation of the gaskets. For watercrafts already equipped with gaskets, an inspection is required to ensure that all three gaskets are present."

66. But here, again, Bombardier did not disclose to consumers that the proposed "gasket" remedy would not correct the underlying design defect. To the contrary, it led consumers to believe that the defect could be remedied with "gaskets."

67. In fact, the "gasket" recall remedy is not effective to correct the Capsizing Defect.

68. Bombardier's issuance of the October 2025 Repair only confirmed that the earlier February 2025 recall remedies failed to correct the defect and was only further misleading.

69. Next, in May 2026, Sea Doo issued a letter to owners titled "Re: Sea-Doo Switch Intelligent Balance Assist (iBA)." In this new disclosure, Sea-Doo represented that it was offering owners of 2022-2026 Sea-Doo Switch models the installation of a "sensor" and updated "software module," and would be "calibrating the system" (the "May 2026 Notice").

70. In the May 2026 Notice, Sea-Doo does not recommend that owners install the iBA system outright. Instead, it describes the iBA system as a feature that will "enhance the boating experience," and claims that it is not necessary for safe operation: "your watercraft is still safe to use with the iBA."

71. According to Sea-Doo as of May 2026, however, iBA "helps operators avoid bow-down operation of the watercraft" and "reduces the risk of capsizing." IBA "will prompt the operator to rebalance" and will allow "full throttle capacity" to "resume only when the watercraft is rebalanced." Sea-Doo describes this as just "one more way to verify that their watercraft is properly balanced during operation to reduce the risk of capsizing."

72. But here, again, Bombardier did not disclose to consumers that the proposed "iBA" update would not correct the underlying design defect. To the contrary, it led consumers to believe

that the risk of capsizing could be materially reduced by installing this software but did not require that it be installed.

73. In fact, iBA is not effective to eliminate or correct the Capsizing Defect.

74. The defect is in the hull design and the wave the hull generates, which causes stern lift and bow drop. This design defect is not remedied via any of the recalls or notices that Sea-Doo has sent to owners and cannot be remedied absent a complete re-design of the Sea-Doo Switch boats.

**F. <u>Bombardier Omitted Material Information Regarding the Capsizing Defect Before and After February 2025.</u>**

75. No consumer who purchased a Sea-doo Switch Boat can discern that truth about the Capsizing Defect from any of Bombardier's statements or materials.

76. Beginning in February 2025, Bombardier disclosed the Capsizing Defect, but misled consumers by obfuscation of the information and inaccurate statements regarding repairs of the Capsizing Defect.

77. Beginning in February 2025 consumers might have learned that the Switch Boats featured a Capsizing Defect, but Bombardier misled consumers into believing that this defect could be repaired and had been repaired on all boats delivered after February 2025.

78. To learn about the Capsizing Defect and the repair Bombardier was offering, a consumer shopping for a Sea-Doo Switch boat after February 2025 would need to scroll all the way to the bottom of the Sea-Doo website to the smaller-print section and click on a non-descript item title "Safety-recalls." And even then, the consumer would be led to believe that there was an effective repair for the Capsizing Defect, which there was none.

79. Thus, from February through October 2025, Bombardier led customers to believe that there was an effective repair for the Capsizing Defect in the form of a sealant and stickers.

80. After October 2025, Bombardier led customers to believe that there was an effective repair for the Capsizing Defect in the form of gaskets and stickers.

81. And at all relevant times, on its website and elsewhere, Bombardier offered, and continues to offer, numerous statements touting its Switch boats, but does not mention alongside these statements that its Switch boats have been recalled on account of a serious safety issue.

82. In its owner's manual, and other written advertising and marketing materials, including on its website, Bombardier omits any explanation of the hazard presented by the Capsizing Defect and fails to include any adequate warning.

83. For example, Bombardier on its website

a. Invites consumers to "Navigate through all the points to learn more about the 2026 Switch," without indicating the safety design defect;

b. Claims that "Extraordinary is one ride away";

c. Invites consumers to "Explore Switch packages and specifications," though following this link does not disclose the design defect;

d. Tells consumers to "Sea-Doo Switch redefines fun and freedom with a modern, modular design";

e. Claims "Our cruising pontoon boats offer the perfect blend of comfort and leisure, designed for days of sunbathing and making cherished memories on the water."

f. Invites consumers to "build and price" and "preorder" a 2026 Sea-Doo Switch, which a consumer can complete without ever seeing any information on the defective design or safety-recall;

g. Features a "News" tab, which includes no news of injuries or deaths due to the Switch defective design;

h. Offers the Sea-Doo Switch product page a "Parts & Maintenance" tab where there is no mention of the safety-recall at all, or the recall-repairs that Sea-Doo itself recommends for the Sea-Doo Switch boats;

i. Offers a two-page, detailed "spec sheet" for the Switch boats, which makes no mention of the Capsizing Defect, the recalls, or the required repairs;

j. Instructs consumers that "[t]o find the one that's right for you, explore the options and tell us how you like to live the Sea-Doo Life," without ever disclosing which ones feature the hull design defect;

k. States on its website that "The 2026 Sea-Doo Switch redefines fun and freedom with a modern, modular design and unbeatable all-in-one value."

l. Represents that consumers can "Experience a whole new way to enjoy life on the water."

m. Promotes the product as "Fun, adaptable and modern with never-before seen value."

n. Represents that the Switch boats are "crafted with the heart of a Sea-Doo and now refined to maximize all your adventures."

o. States that the "2026 Switch Cruise is a modern pontoon boat that blends Sea-Doo spirit with true pontoon comfort."

p. Claims that the "modular deck and Rotax power make every outing easy, fun and versatile."

q. Promotes the Switch boats as "built for tow sports fans and active families."

r. Represents that the Switch boats' "bold style and modular layout bring comfort, excitement and utility together in one incredibly versatile package."

s. Represents that "Unmatched comfort, premium convenience and cutting-edge tech come together in the 2026 Switch Cruise Limited."

t. States that one of the Switch boat's "exclusive pontoon package turns every ride into a luxurious escape."

84. Each of the foregoing statements, and others, are materially misleading and deceptive because Bombardier does not disclose that the Sea-Doo Switch boats include the Capsizing Defect.

85. Bombardier failed to disclose to consumers that the Switch boats were prone to instability and capsizing due to water accumulation in the forward hull and due to a defective hull design, which caused stern lift and bow drop. Bombardier also failed to disclose that certain operating conditions could cause water to accumulate in the forward hull and destabilize the Switch boats, as well as generate a dangerous hull wave that caused instability and capsizing risk.

86. The existence of a Capsizing Defect is a material fact to a reasonable consumer purchasing a recreational watercraft.

87. Had Bombardier disclosed the defect, reasonable consumers would not have purchased the Switch boats or would have paid substantially less for them.

88. The Capsizing Defect makes the Switch boats worth less than what the Plaintiffs paid for them. A Switch boat with a defective hull design is worth less than one with a safe hull.

## PLAINTIFF SPECIFIC ALLEGATIONS

**LORI LONG**

89. In June 2025, Plaintiff Lori Long purchased a 2024 Switch Cruise from a dealership in Deerfield Beach, Florida, for approximately $32,544.00.

90. At the time of purchase, Ms. Long was looking for a pontoon boat she could enjoy with her family on the lake where she lives.

91. At the time of purchase, Ms. Long was given the standard paperwork that accompanies the sale of Switch boats.

92. Through its marketing and advertising, Bombardier represented to Ms. Long that the Switch boats were seaworthy.

93. Bombardier failed to disclose to Ms. Long that the Switch boat featured the Capsizing Defect.

94. Bombardier's omissions were likely to deceive a reasonable person in Ms. Long's position who was purchasing a Switch boat because they would leave that person with the mistaken impression that the Switch boat was not defective and would function safely and reliably.

95. If Bombardier had truthfully represented the nature of the hull dynamics and disclosed the existence of the Capsizing Defect, a reasonable person in Ms. Long's position would not have purchased the Switch boat.

96. Due to the existence of the Capsizing Defect, Ms. Long's Switch "Cruise" is worth less than fair market value.

97. The defect in Ms. Long's Switch Cruise is materially identical to the defect in the other Switch boat models identified in paragraphs 40-44 above.

**JAMES ABREU**

98. In August 2023, Plaintiff James Abreu purchased a 2023 Switch Cruise, 230 horsepower, from a dealer located in Bonita Springs, Florida, for approximately $53,036.12.

99. At the time of purchase, Mr. Abreu had recently retired and moved to Florida and purchased the boat to be used as a rental to earn additional income.

100. At the time of purchase, Mr. Abreu was given the standard paperwork that accompanies the sale of Switch boats.

101. Bombardier represented to Mr. Abreu that the Switch boats were seaworthy.

102. Bombardier failed to disclose to Mr. Abreu that the Switch boat featured the Capsizing Defect.

103. Bombardier's omissions were likely to deceive a reasonable person in Mr. Abreu's position who was purchasing a Switch boat because they would leave that person with the mistaken impression that the Switch boat was not defective and would function safely and reliably.

104. If Bombardier had truthfully represented the nature of the hull dynamics and disclosed the existence of the Capsizing Defect, a reasonable person in Mr. Abreu's position would not have purchased the Switch boat.

105. Due to the existence of the Capsizing Defect, Mr. Abreu's Switch boat is worth less than fair market value.

106. The defect in Mr. Abreu's Switch Cruise is materially identical to the defect in the other Switch boat models identified in paragraphs 40-44 above.

**SCOTT BAUER**

107. In August 2023, Plaintiff Scott Bauer joined a waitlist and paid a $1,000 deposit to a dealer located in Tampa, Florida, for his chance to purchase a Sea-Doo Switch boat.

108. Thereafter, Mr. Bauer purchased a 2022 Switch, for an amount in excess of $25,000.00.

109. At the time of purchase, Mr. Bauer was in the market for a boat to enjoy in the ocean with his grandkids and his friends.

110. At the time of purchase, Mr. Bauer was given the standard paperwork that accompanies the sale of Switch boats.

111. Bombardier represented to Mr. Bauer that the Switch boats were seaworthy.

112. Bombardier failed to disclose to Mr. Bauer that the Switch featured the Capsizing Defect.

113. After the February 2025 Recall, Mr. Bauer took his boat in for repair.

114. Bombardier's omissions were likely to deceive a reasonable person in Mr. Bauer's position who was purchasing a Switch boat because they would leave that person with the mistaken impression that the Switch boat was not defective and would function safely and reliably.

115. If Bombardier had truthfully represented the nature of the hull dynamics and disclosed the existence of the Capsizing Defect, a reasonable person in Mr. Bauer's position would not have purchased the Switch boat.

116. Due to the existence of the Capsizing Defect, Mr. Bauer's Switch boat is worth less than fair market value.

117. The defect in Mr. Bauer's Switch Cruise is materially identical to the defect in the other Switch boat models identified in paragraphs 40-44 above.

**CRAIG CORLEW**

118. In May 2023, Plaintiff Craig Corlew bought two Sea-Doo Switch boats from a dealer in Kissimmee, Florida.

119. For each boat, Mr. Corlew paid approximately $37,399.00.

120. At the time of purchase, Mr. Corlew was given the standard paperwork that accompanies the sale of Switch boats.

121. Bombardier represented to Mr. Corlew that the Switch boats were seaworthy.

122. Bombardier failed to disclose to Mr. Corlew that the Switch boats featured the Capsizing Defect.

123. Mr. Corlew's boats were repaired by the dealer Central Florida PowerSports consistent with the Bombardier's instructions.

124. Bombardier's omissions were likely to deceive a reasonable person in Mr. Corlew's position who was purchasing a Switch boat because they would leave that person with the mistaken impression that the Switch boat was not defective and would function safely and reliably.

125. If Bombardier had truthfully represented the nature of the hull dynamics and disclosed the existence of the Capsizing Defect, a reasonable person in Mr. Corlew's position would not have purchased the Switch boats.

126. Due to the existence of the Capsizing Defect, Mr. Corlew's Switch boats are worth less than fair market value.

127. The defect in Mr. Corlew's Switch boats is materially identical to the defect in the other Switch boat models identified in paragraphs 40-44 above.

## CLASS ACTION ALLEGATIONS

128. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23.

Class Definition

129. Plaintiffs seek to represent the following Nationwide Class:

Class

All persons and entities who purchased a Switch boat within the United States within the applicable limitations period (the "Class Period").

Excluded from this class are Bombardier, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees and the Judge to whom the action is assigned and any member of the Judge's staff and immediate family.

130. Plaintiffs seek to represent the following Florida Class:

All persons and entities who purchased a Switch Boat within Florida within the applicable limitations period (the "Florida Class Period").

Excluded from this class are Bombardier, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees and the Judge to whom the action is assigned and any member of the Judge's staff and immediate family.

131. Plaintiffs will additionally seek to certify statewide class action claims on behalf of sub-classes in the following states, all with consumer-protection statutes materially identical to Florida's consumer-protection statute: Alaska, California, Connecticut, D.C., Delaware, Florida, Hawaii, Idaho, Illinois, Iowa, Kentucky, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Rhode Island, Washington, and Wisconsin.

132. Each of the State Classes is initially defined as:

All persons or entities who purchased a Sea-Doo Switch pontoon boat within the state of ___________(*e.g.*, Alaska) within the applicable limitations period (the "____ Class Period").

Excluded from this class are Bombardier, its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees and the Judge to whom the action is assigned and any member of the Judge's staff and immediate family.

133. The proposed Nationwide and Florida Classes and their members are sometimes referred to as the "classes."

134. Plaintiffs reserve the right to amend the definition of the classes if discovery and further investigation reveal that the classes should be expanded or otherwise modified.

135. Plaintiffs reserve the right to establish sub-classes as appropriate.

136. The action may be maintained as a class action because it meets all the requirements of Rule 23(a) and (b).

**A. Requirements of Federal Rule of Civil Procedure 23(a)**

137. The action satisfies all the requirements of Rule 23(a).

**1. Numerosity**

138. The Nationwide and Florida Class members are so numerous that joinder of all members is impracticable.

139. As of 2025, Bombardier indicated that approximately 17,000 Switch boats had been manufactured, approximately 14,000 of which were already sold to consumers. Bombardier has continued to sell Switch Boats since that time.

140. On its website, Bombardier represents that it sells its Sea-Doo pontoon boats in over one hundred stores nationwide and in three dozen stores throughout Florida.

141. The exact number of Florida Class members, as well as Nationwide Class members, including the class members' names and addresses, can be identified from Bombardier's business records.

**2. Commonality**

142. Common questions of law and fact exist as to Plaintiffs', the Nationwide Class members', and the Florida Class members' claims. These common questions include, but are not limited to, the following:

a. Whether Bombardier engaged in a deceptive and unfair trade practice by its omissions regarding the design defect in the Switch boats that causes water to accumulate in the forward hull, and the design defect that generated a hull wave that created stern lift and bow drop, leading the Switch boats in some cases to capsize;

b. Whether Bombardier engaged in a deceptive and unfair trade practice by its affirmative representations regarding the repairs to address the design defect in the Switch boats that causes water to accumulate in the forward hull, leading the Switch boats in some cases to capsize;

c. Whether Bombardier's representations and omissions were likely to deceive a reasonable person who was purchasing a Switch boat because they would leave him or her with the mistaken impression that the boats were not defective and would function safely and reliably;

d. Whether, if Bombardier had truthfully represented the nature of the Switch boats and disclosed the existence of the defect, a reasonable person would not have purchased the Switch boat;

e. Whether, because of the nature of the design defect, the Switch boats are worth less than what consumers paid for them;

f. Whether and to what extent Bombardier's conduct injured the Plaintiffs, Nationwide Class members, and Florida Class members;

g. Whether Bombardier unlawfully enriched itself at the expense of the Plaintiffs, Nationwide Class members, and Florida Class members; and

h. Whether Bombardier's conduct violated Florida's Deceptive and Unfair Trade Practices Act.

**3. Typicality**

143. Plaintiffs' claims are typical of the Nationwide Class members' and the Florida Class members' claims because of the uniformity and common purpose of Bombardier's unlawful conduct. Plaintiffs, like all Class members, were damaged through their purchase of Switch boats with a defective, materially identical design defect.

144. All Switch boats feature the same defective design that causes water to accumulate in the forward hull, leading the Switch boats to be at risk of capsizing.

145. Each Nationwide and Florida Class member has sustained and will continue to sustain damages in the same manner as Plaintiffs as a result of Bombardier's unlawful conduct.

**4. Adequacy**

146. Plaintiffs will fairly and adequately represent the interests of the members of the classes because they have suffered the same wrongs as the members of the classes. Plaintiffs do not have claims that are unique to Plaintiffs and not the other class members, nor are there defenses unique to Plaintiffs that could undermine the efficient resolution of the claims of the classes.

147. Plaintiffs are fully cognizant of their responsibilities as class representatives and have retained Maderal Byrne & Furst and Goldberg & Rosen to prosecute this case. Maderal Byrne & Furst and Goldberg & Rosen are experienced in complex class action litigation, including litigation related to unfair and deceptive trade practices and have the financial and legal resources to meet the costs of, and understand the legal issues associated with, this type of litigation.

**B. Requirements of Federal Rule of Civil Procedure 23(b)(3)**

148. This action satisfies all the requirements of Rule 23(b)(3).

149. The questions of law and fact enumerated above predominate over questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Among other things:

a. The Nationwide and Florida Class members' interests in individually controlling the prosecution or defense of separate actions is very low because of the extensive time and considerable expense necessary to conduct such litigation as well as the relatively small amount of damages sought by each individual class member;

b. The extent and nature of any litigation concerning the controversy already begun by or against class members is non-existent in that there are no active lawsuits of which the undersigned is aware that are asserting economic damages based on misrepresentations and omissions about the defective design of the Switch boats;

c. The desirability of concentrating the litigation of the claims in this particular forum is high, given the Florida Class at issue; and

d. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

**COUNT 1**
**VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT**
**(On behalf of the Florida Class)**

150. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 127 above as though fully set forth herein.

151. This Count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

*152.* At all times material, Plaintiffs and the Florida Class members were "consumers" within the meaning of Fla. Stat. § 501.203(7).

153. At all times material, Bombardier conducted trade and commerce within the meaning of Fla. Stat. § 501.203(8).

154. By the acts and conduct alleged herein, Bombardier has committed unfair and deceptive acts and practices by omissions on its website, in the advertising of the defective Switch boats, and in the owner's manuals for the Switch boats, which acts and practices were directed at consumers.

155. Prior to February 2025, Bombardier failed to disclose to consumers in any form—whether through advertising and marketing materials, via its website, direct mail, in owner's manuals, or the like—that the Switch boats had a Capsizing Defect. After February 2025, Bombardier disclosed the defect, but failed to do so accurately and instead, misled consumers into believing there was a repair.

156. Separately, Bombardier had a duty to disclose Capsizing Defect. Bombardier had this duty because:

a. The defect was a latent defect;

b. the defect was serious, life threatening, and likely to cause significant bodily harm;

c. Bombardier knew about the defect;

d. Plaintiffs and the Florida Class members are unsophisticated, did not have access to the same information as Bombardier, and did not know about the defect; and

e. Bombardier affirmatively represented that the Switch boats were seaworthy and could be enjoyed on the water.

157. Separately and alternatively, Bombardier's acts and practices were unfair because they were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

158. Specifically, the Bombardier Defendants:

a. knew that the Switch boats were being used by a particularly vulnerable group of people, including first-time boat owners and families;

b. knew that consumers would naturally assume that the Switch boats were safe for normal use, including use by groups of people; and

c. knew that the Switch boats were not, in fact, safe, because of the Capsizing Defect.

159. The unfair and deceptive acts and practices alleged above occurred in connection with Bombardier's trade and commerce in Florida, including through Bombardier's advertising, soliciting, providing, offering, and distributing, whether by sale, rental, or otherwise, of Switch boats.

160. Bombardier's unfair and deceptive acts and practices were likely to deceive objective reasonable consumers.

161. Bombardier's unfair and deceptive practices—the alleged misrepresentations and omissions—were material because they concerned a matter to which a reasonable person would attach importance in making his or her decision to purchase the Switch boats, namely, the safety of the Switch boats.

162. Had Bombardier not omitted and misrepresented the Capsizing Defect and actually disclosed it, objective reasonable consumers would not have purchased the Switch boats.

163. Bombardier's unfair and deceptive acts and practices resulted in Plaintiffs and Florida Class members paying more for the Switch boats than what the Switch boats were actually worth.

164. As a direct and proximate result of Bombardier's FDUTPA violations, Plaintiffs and Florida Class members have been damaged in an amount to be proven at trial.

At some future date and time, Plaintiffs and Florida Class members will seek court approval to assert consumer-protection claims on behalf of class members from other states that have consumer-protection statutes materially identical to FDUTPA. Specifically, they will seek approval to assert claims on behalf of class members from the following states: Alaska, California, Connecticut, D.C., Delaware, Florida, Hawaii, Idaho, Illinois, Iowa, Kentucky, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Rhode Island, Washington, and Wisconsin.

165. Plaintiffs and Florida Class members are entitled to actual damages, declaratory and injunctive relief, attorneys' fees and costs, and all other remedies available under FDUTPA.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Florida Class members, respectfully demand judgment against Defendants for actual damages, plus attorneys' fees and costs, and any other relief to which they are entitled.

**COUNT 2**
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class)**

166. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 127 above as though fully set forth herein.

167. Plaintiffs and Nationwide Class members conferred a benefit on Bombardier through their payment for the Switch boats, allowing Bombardier to enrich itself to the detriment of the class.

168. Bombardier voluntarily accepted and retained the benefit.

169. Under the circumstances, it would be inequitable for Bombardier to retain the benefit, as it was obtained unlawfully through unfair and deceptive practices.

170. Plaintiffs and Nationwide Class members suffered damages as a result of Bombardier's misconduct.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Nationwide Class members, respectfully demand judgment against Defendants for actual damages and any other relief to which they are entitled.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves, the Nationwide Class, the Florida Class, and state sub-classes, request the following relief:

a. Certification of the Nationwide Class and the Florida Class;

b. Certification of state sub-classes;

c. Appointment of Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

d. A jury trial and judgment against Defendants Bombardier;

e. A declaration and an order requiring that Bombardier make full and accurate disclosure regarding the risks associated with the Capsizing Defect on its Switch boats;

f. The costs of suit, including reasonable attorneys' fees, in accordance with FDUTPA;

g. General, actual, and compensatory damages in an amount to be determined at trial;

h. Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law; and

i. Such other relief to which the Court deems the Plaintiffs entitled.

**DEMAND FOR JURY TRIAL**

Plaintiffs request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Date: June 25, 2026

Respectfully submitted,

*/s/Rachel Wagner Furst*

**MADERAL BYRNE & FURST PLLC**
Rachel Wagner Furst, Fla. Bar No. 45155
E-Mail address: rachel@maderalbyrne.com
2800 Ponce De Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Telephone: (305) 520-5690

**GOLDBERG & ROSEN, P.A.**
Judd G. Rosen, Fla. Bar No. 0458953
Brett M. Rosen, Fla. Bar No. 44859
Mustafa H. Dandashly, Fla. Bar No. 118159
Primary E-mail:
pleadings@goldbergandrosen.com
Secondary E-mails:
judd@goldbergandrosen.com;
brett@goldbergandrosen.com;
mdandashly@goldbergandrosen.com
One Biscayne Tower
2 South Biscayne Boulevard, Suite 3650
Miami, Florida 33131
Telephone: (305) 374-4200

*Counsel for Plaintiffs*